*By order of the Bankruptcy Appellate Panel, the precedential effect of this decision is limited to the case and parties pursuant to 6th Cir. BAP LBR 8013-1(b). See also 6th Cir. BAP LBR 8010-1(c)).*

File Name: 08b0006n.06

## BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT

| | |
|---|---|
| In re: STARDUST YACHTS, LLC,<br><br>                Debtor.<br>_____<br><br>MICHAEL BERNARD and<br>ACTON ENTERPRISES, INC.,<br><br>                Appellants,<br><br>v.<br><br>G&G LLC,<br><br>                Appellee.<br>_____ | No. 07-8014 |

Appeal from the United States Bankruptcy Court
for the Eastern District of Kentucky, London Division.
No. 06-60792.

Argued: November 14, 2007

Decided and Filed: April 9, 2008

Before: AUG, RHODES, and WHIPPLE, Bankruptcy Appellate Panel Judges.

_____

COUNSEL

**ARGUED:** John O. Morgan, Jr., Lexington, Kentucky, for Appellants. Douglas L. Lutz, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellee. **ON BRIEF:** John O. Morgan, Jr., Chrisandrea Turner Ingram, Lexington, Kentucky, for Appellants. Douglas L. Lutz, FROST BROWN TODD LLC, Cincinnati, Ohio, Marc E. Albert, Katherine M. Sutcliffe Becker, STINSON, MORRISON HECKER LLP, Washington, D.C., for Appellee.

# OPINION

MARY ANN WHIPPLE, Bankruptcy Appellate Panel Judge. Michael Bernard and Acton Enterprises, Inc. ("Appellant") appeal an order of the bankruptcy court granting G&G LLC's ("G&G") motion for order allocating proceeds from an auction sale of the assets of Stardust Yachts, LLC ("Debtor"). The order disbursed the sale proceeds in an 88.89/11.11 ratio of real to personal property, rather than a 78/22 ratio that the Appellant asserts was agreed to prior to the auction.

## I. ISSUES ON APPEAL

The issues raised by this appeal are whether the bankruptcy court committed reversible error by: (1) not holding an evidentiary hearing regarding whether an agreement on the allocation of proceeds of the auction existed; (2) finding that there was no agreement regarding the allocation of proceeds from the auction of the Debtor's assets; and (3) finding that the Appellant did not detrimentally rely on an agreement to allocate proceeds of the auction.

## II. JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Eastern District of Kentucky has authorized appeals to the Panel and a final order of the bankruptcy court may be appealed as of right. 28 U.S.C. § 158(a)(1). For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted).

The bankruptcy court's conclusions of law are reviewed de novo. *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940 (6th Cir. 2007). "Under a *de novo* standard of review, the reviewing court decides an issue independently of, and without deference to, the trial court's determination." *Menninger v. Accredited Home Lenders (In re Morgeson)*, 371 B.R. 798, 800 (B.A.P. 6th Cir. 2007). The court's findings of fact are reviewed under the clearly erroneous standard. *In re DSC, Ltd.*, 486 F.3d at 944. "A finding of fact is clearly erroneous 'when although

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504 (1985)).

### III. FACTS

Stardust Yachts, LLC ("Debtor") borrowed money from Citizens National Bank ("Citizens") with a balance owed of approximately $497,000. The loan was secured by a first priority lien on all of the Debtor's personal property. The Debtor also borrowed approximately $3 million from G&G LLC ("G&G"). This loan was secured by a first priority lien in favor of G&G on all of the Debtor's real property, and a second priority lien on the Debtor's personal property.

The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code and quickly filed a motion to authorize and schedule an auction to sell substantially all of its assets. The bankruptcy court granted the motion and issued a Sale Auction Procedures Order that established the bidding procedures. The auction was scheduled for March 7, 2007, at the offices of Debtor's counsel.

Prior to the auction, Citizens and G&G discussed the allocation of proceeds of the sale between real and personal property in the event that a bid was accepted by the Debtor, and approved by the bankruptcy court, for all of the Debtor's property. Evidencing these discussions is a letter from G&G's counsel to counsel for Citizens dated March 2, 2007, which "confirms [their] agreement" that ". . . in the event a bid is accepted by the Debtor and approved for all of the Debtor's property, the proceeds will be allocated as follows: 22% represents the value of the Debtor's Personal Property, in which [Citizens] has a more senior lien than G&G, and 78% represents the value of the Debtor's Real Property, in which [G&G] has a lien." (J.A. at 197.) In closing the letter, G&G's counsel requested that counsel for Citizens sign in the space provided to indicate her agreement and return a copy. Counsel for Citizens did not sign or return the letter.

On March 6, 2007, counsel for G&G prepared and sent a subsequent unsigned letter that "clarifi[es] [his] March 2, 2007, letter on [the] agreement related to the sale of assets." (J.A. at 276.) The "agreement" as to the allocation of proceeds reads the same as that in the March 2, 2007, letter.

Once again, the letter requested that counsel for Citizens indicate agreement by signing the letter in the space provided and returning a copy. Again, counsel for Citizens did not sign or return the letter.

On March 7, 2007, prior to the time of the auction, the Appellant[1] entered into an Assignment of Secured Claims, Notes, Security Agreement, and Guaranties ("Assignment") with Citizens through its Executive Vice-President, Charles Farris. The Assignment contains a detailed description of the rights and interests that were transferred. However, it makes no reference to the auction or an agreement with G&G regarding allocation of sales proceeds. The Appellant asserts that he paid $300,000 for the notes.[2]

In addition to being a secured creditor with a lien on the personal property of the Debtor by virtue of the Assignment, the Appellant was previously granted a super priority lien in the amount of $120,000 on the Debtor's equipment and inventory to secure post-petition financing provided to the Debtor. Pursuant to the Sale Auction Procedures Order, the Appellant had the right to credit bid his super priority loan of $120,000, and the Assignment of Citizens' claim of approximately $505,000 for a total credit bid of $625,000.

The auction took place as scheduled on March 7, 2007. Counsel for the Debtor conducted the auction in three phases: (1) real property only; (2) personal property only; and lastly (3) real and personal property together. In the first round, G&G submitted the highest bid, a credit bid of $2 million. Bidding was then closed. In the second round, the Appellant made the highest bid for the personal property of $250,000. Several bidders then asked to adjourn the bidding to determine if any competing bidder would top the Appellant's bid. The bidding was adjourned and when the bidders returned they advised that they would make no further bids. According to the Appellant, he then advised that he had more "credit to bid" and was told by Debtor's counsel that it was unnecessary

---

[1] Both Michael Bernard, Managing Member of Acton Enterprises, Inc., and Acton Enterprises, Inc. are appellants. However, because Acton acted through Bernard, we refer to the Appellant in the singular.

[2] Nothing in the record other than the Appellant's brief reveals the actual price paid for the assignment. Indeed, the assignment itself simply states "[f]or value received." (J.A. at 262.) In any event, the amount paid for the assignment is irrelevant to our decision here.

to bid higher. Second round bidding was then closed.[3] In the third round, G&G made the highest bid for both real and personal property together with an over bid of $10,000 for a total bid of $2,260,000.

At that point, either counsel for the Appellant, or Michael Bernard himself, asked how the proceeds of sale would be allocated between the real and personal property. The Appellant asserts that it was his counsel, who was new to the case, who made the inquiry.[4] G&G does not state unequivocally who asked the question, only that it was someone on behalf of Appellants, and exactly who is irrelevant. Regardless of who asked the question, the response was apparently that the allocation had not been determined. Apparently no one, including the Appellant, disputed that statement. There is no recording or transcript of the auction in the record to verify either version of events.

The Appellant then requested that the second phase of bidding be re-opened to permit him to credit bid higher on the personal property. Counsel for the Debtor then contacted G&G's counsel to participate in discussions as to whether this should be permitted. The Appellant explained that he "believed it was in the best interest of the debtor and its creditors to re-open the bidding for the real estate separately and the personal property separately to afford both G&G and [Appellant] the right to increase their bids, since their previous bids had not reached their respective credit bid allowances." (J.A. at 183.) The bidding was not re-opened to allow the requested deviation from the pre-auction announcement as to procedure. The third round bidding was continued and G&G's bid was accepted as the highest bid for the Debtor's total assets in the amount of $2,260,000.

The day after the auction, the Debtor filed a Report of Sale describing in detail the auction process and seeking approval for the sale of assets to G&G for $2,260,000. On that same day, G&G's counsel received an email from counsel for Citizens which read, in pertinent part, "[y]ou are

---

[3] The Appellant also made this assertion in his Objection to Report of Sale. However, in its response to that objection, the Debtor asserted that this did not occur. According to the Debtor, the only time the Appellant indicated his desire to credit bid higher was after the third round of the auction had begun.

[4] In the Appellant's response to G&G's motion for an order allocating sale proceeds, he states that "undersigned counsel for [Appellant], who literally came into the matter five minutes before the sale, asked W. Thomas Bunch how the aggregate sale proceeds would be allocated, and Mr. Bunch stated he did not know." (J.A. at 193.)

correct that I was not authorized and did not sign the letter agreement you sent to me regarding allocation and you are correct that Citizens has sold both of their notes to [Appellant]." (J.A. at 255.)

On March 9, 2007, the Appellant filed an objection to the sale on the grounds that he was not permitted to bid up to the full amount of his credit bid for the Debtor's personal property.[5] He asserted, therefore, the sale did not result in the maximum benefit to the bankruptcy estate and its creditors. Also on March 9, 2007, G&G filed a motion for an order allocating the auction proceeds in a 88.89/11.11 ratio of real to personal property, a ratio that was derived from the bidding at the auction. The Appellant responded that a 78/22 ratio would be more appropriate. According to Appellant, he purchased and took assignment of the claims of Citizens based upon statements from counsel for G&G and Citizens that the allocation would be 78/22, an allocation that was derived from appraisals obtained of each asset type when the Debtor obtained its loan from G&G. In support of his position, the Appellant attached the March 2, 2007, letter from G&G's counsel to counsel for Citizens.

In response to the Appellant's request that the proceeds be allocated in a 78/22 ratio of real to personal property, G&G asserted that while counsel for G&G and Citizens agreed that such an allocation would be appropriate, their clients never agreed. In support of this assertion, G&G noted that the March 2, 2007, letter was not signed by counsel for Citizens, and attached the March 8, 2007, email of counsel for Citizens stating that she was not authorized to sign the letter. G&G further relied upon its assertion that the Appellant had asked at the auction how the proceeds would be allocated. According to G&G, the Appellant would not have asked this question if he believed there was an agreement in place. Finally, G&G urged the bankruptcy court to allocate the proceeds in the ratio of the bids actually received, 88.89 to 11.11.

The Appellant then filed two motions to supplement the record regarding G&G's motion for order allocating the sales proceeds. With the first motion, the Appellant submitted a copy of the March 6, 2007, letter from G&G's counsel to counsel for Citizens. With the second motion, the

---

[5] Appellant has not appealed the order confirming the sale of assets.

Appellant submitted an affidavit of Charles Farris ("Farris"), the Executive Vice-President of Citizens. Farris's affidavit reads in pertinent part as follows:

> 1. I am Executive Vice-President of Citizens . . . .
>
> 2. I was the loan officer in charge of the matter of two unpaid promissory notes owed by [Debtor] to [Citizens] . . . .
>
> . . .
>
> 4. [Citizens' counsel] . . . discussed with counsel for . . . G&G . . . the proposed auction sale of the debtor's assets, and how to allocate any aggregate purchase price if one bidder purchased both the real estate and personal property of the debtor in a combined bid.
>
> 5. I believed that [Citizens' counsel], counsel for G&G and debtor's counsel concurred that the best way to allocate any combined purchase price would be based on existing appraisals of the real estate and personal property, equating to approximately 78%/22%, respectively. There were some details to be resolved, possibly about carve-outs and/or taxes that I cannot recall, but which had no effect on the allocation percentages, to my understanding. I never heard any different numbers. It was my understanding that the allocation and terms were subject to the court's approval. I conveyed all this to [Appellant] in the presence of bank counsel during negotiations of the sale of Citizens' . . . notes, etc. and before the sale of Citizen's notes, etc. was consummated.

(J.A. at 290-91.)

The bankruptcy court held a hearing on G&G's motion for an order allocating the sale proceeds, and the Appellant's motions to supplement the record. On March 27, 2007, the bankruptcy court entered an order allocating the proceeds from the auction sale. The court found the following: On March 7, 2007, the Debtor conducted an auction for the sale of its assets pursuant to a Sale Procedures Order. At that auction, the Appellant had the right to credit bid his super priority loan of $120,000 and Citizens' assignment of its approximate $505,000 position secured by the Debtor's personal property. Prior to the auction and the assignment of Citizens' claim, G&G and Citizens were attempting to negotiate an agreement on the allocation of sales proceeds between the real and

personal property at 78% and 22%, respectively. Those negotiations "were memorialized in two proposed letter agreements . . . neither of which was signed by counsel for Citizens Bank." (J.A. at 293.) The bankruptcy court found that there was no binding agreement on the allocation of proceeds as evidenced by the March 8, 2007, email sent by counsel for Citizens in which she stated she was not authorized to sign the letters.

The bankruptcy court further found that the Appellant's assertion that he detrimentally relied on oral representations as to the agreement to allocate the sales proceeds on a 78/22 ratio basis were undermined by his conduct both at and after the auction. Specifically, the court noted that during the third round of bidding "[Appellant] said, 'I have a question, Mr. Bunch, how do you allocate the real and personal property sale price when you accept the aggregate bid. [Appellant] would not have inquired as to allocation of the proceeds had he believed that there was an agreement to which he was a beneficiary." (J.A. at 295.) Additionally, the court noted the fact that the Appellant asked for the second round bidding to be re-opened undermined his assertion that he detrimentally relied on an agreement between Citizens and G&G.

Finally, the bankruptcy court found that the Appellant's assertions in his Objection to Report of Sale undermined his argument. The objection was filed two days after the auction and requested that the auction be re-opened to allow him to bid his entire credit bid. The bankruptcy court found that the Appellant's statements in the objection that "the proposed limited re-bidding process will also eliminate the difficulty of allocating the aggregate purchase price between G&G and [Appellant] as secured creditors on different collateral" and that "approval of the March 7 Auction would unfairly reduce the percentage allocation that [Appellant] receives from the aggregate sale proceeds, a problem not contemplated in the Sales Procedure Order, the Notice of Auction, or by oral announcement prior to the Auction" revealed that the Appellant was unaware of an agreement regarding allocation. (J.A. at 296.) Finally, the court found that:

> [Appellant] was not even aware of an agreement two days after the purchase of the claim an (sic) the auction. Second, his claims of detrimental reliance only appears (sic) in his Objection, Motion to Supplement and Second Motion to Supplement. These were all filed after G&G filed its Motion in which G&G stated that it had tried to reach an agreement with Citizens but had failed to do so.

-8-

> Second, the Objection to Report of Sale reveals that [Appellant] fully believed that the allocation was to (sic) based on the bidding prices made at the Auction. Otherwise, [Appellant] would not have objected to the Report of Sale based on the injustice of not being given the opportunity to bid the full amount of his credit bid which would have elevated the percentages allotted to his portion of the sales proceeds.

(J.A. at 296.)

The court then sustained G&G's motion for order allocating sales proceeds and ordered that the proceeds be disbursed under a "88.89%/11.11% allocation scheme with a Sales Price for the Real Property of $2,008,914.00 and for Personal Property of $251,086.00." (J.A. at 297.) Pursuant to the bankruptcy court's order, the Appellant shall receive $120,000 for its super priority lien and an additional $60,010.13 from the distribution of proceeds for the personal property.[6]

This timely appeal of the bankruptcy court's order allocating the sale proceeds followed.

## IV. DISCUSSION

The Appellant makes a number of arguments as to why he believes the bankruptcy court erred. He asserts that the bankruptcy court erred in finding that there was no binding agreement regarding the allocation of sales proceeds because it failed to "consider that G&G was the party representing it would receive only 78 percent of the auction proceeds" and "the offer was never withdrawn by G&G before the sale." (Appellant's Br. at 15.) He contends that the bankruptcy court also erred because the order fails to mention discussions between Citizens and the Appellant, focuses solely on the alleged discussions between G&G and Citizens, and "refused to acknowledge the Affidavit of Charles B. Farris, Executive Vice-President of [Citizens]." (Appellant's Br. at 16.) In support of his position, the Appellant points to the court's attribution of the question at the auction regarding how the proceeds would be allocated to him, despite the fact that the auction was not recorded, and that the court was not present. He also argues that the bankruptcy court should have

---

[6] The bankruptcy court's order additionally set forth in detail how the real property and personal property were to be distributed. However, the Appellant is appealing only the allocation of the proceeds in a 88.89/11.11 ratio of real to personal property.

concluded that a contract implied in fact existed between the parties to allocate the auction proceeds in a 78/22 ratio. Further, the Appellant argues that he relied on the alleged agreement to his detriment. Because he purchased the Citizens' notes for $300,000 and is only receiving $60,010.13 rather than 22% of the sales proceeds, the transaction is not yielding the return he expected.

Finally, while nothing in the record before us indicates that the Appellant requested an evidentiary hearing on this matter, he argues that an evidentiary hearing should have been held to determine whether an agreement existed. However, he did not request an evidentiary hearing and never raised the issue with the bankruptcy court. Therefore, because the issue is being raised for the first time on appeal, it has been waived and we will not consider it. *R.D.F. Devs., Inc. v. Sysco Corp. (In re R.D.F. Devs., Inc.)*, 239 B.R. 336, 340 (B.A.P. 6th Cir. 1999) ("Appellate courts ordinarily do not consider issues raised for the first time on appeal and an argument is waived that is not first presented to the bankruptcy court.") (citations and internal quotations omitted).

*A. There Was No Binding Agreement Between Citizens and G&G on the Allocation of Sale Proceeds*

"An enforceable agreement exists when the parties exchange a valid offer and acceptance." *Cali-Ken Petroleum Co., Inc. v. Miller*, 815 F. Supp. 216, 217 (W.D. Ky. 1993) (citing *Whitaker v. Associated Credit Servs.*, 946 F.2d 1222, 1226 (6th Cir. 1991)). A valid offer and acceptance require "a mutual manifestation of assent, a meeting of the minds as to the terms of the contract." *Whitaker*, 946 F.2d at 1226. A party seeking to enforce an agreement has the prima facie burden of establishing its existence, which can be met by providing copies of the written and signed agreement. *Louisville Peterbilt, Inc. v. Cox*, 132 S.W. 3d 850, 857 (Ky. 2004). Under Kentucky law, "where the alleged expressed contract is oral, the evidence to support it must be clear and convincing." *Indus. Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 288 (6th Cir. 1977).

In this case, the absence of a binding agreement, either written or oral, is shown by the unsigned letters. The March 2, 2007, letter regarding the discussions was never signed by counsel for Citizens. The March 6, 2007, letter was not signed by counsel for either party. Counsel for Citizens has clearly stated that she did not have authority to sign the agreement on behalf of her client. Furthermore, the March 2 and 7 letters do not rise to the level of clear and convincing

evidence that G&G and Citizens had entered into an oral agreement given that G&G's counsel specifically requested in the letters that counsel for Citizens sign in the space provided to indicate agreement with the terms set forth in the letter. There is no evidence of a "mutual manifestation of assent," and, therefore, no evidence of a binding contract. The bankruptcy court's finding that Citizens and G&G did not have a binding agreement was not clearly erroneous.

Likewise, the bankruptcy court did not err in failing to find that there was a contract implied in fact. "A contract implied in fact is a true contract, shown by evidence of facts and circumstances from which a meeting of minds concerning the mutual promises may be reasonably deduced." *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. App. 1987) (citing *Thompson v. Hunter's Ex'r*, 269 S.W.2d 266 (Ky. 1954)). Such a contract requires an actual agreement or meeting of the minds, even though not expressly stated. *Kellum v. Broning's Adm'r*, 21 S.W.2d 459, 466 (Ky. 1929). To establish a contract implied in fact, "the facts and circumstances must be sufficient to clearly and convincingly manifest or prove a mutual assent of minds to enter into the contract sought to be implied or established." *Id.* While such a contract may be established by circumstantial evidence, such evidence must still establish the essential elements of a contract. *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 886 (E.D. Ky. 2003). "It must be clear and certain that there was in fact an agreement, positively definite and mutually understood." *Finn v. Finn's Adm'r*, 244 S.W.2d 435, 437 (Ky. 1951). In order to establish a contract implied in fact and meet the necessary quantum of proof, all essential parts of the contract must be agreed to with nothing left to future discussions. With reference to Kentucky law, the Court of Appeals for the Sixth Circuit has explained:

> If there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement, even though the negotiations evidenced a complete willingness, or even an announced determination, to agree in the future upon such issues as might subsequently arise, it must still follow that a valid and binding contract was not made. . . .

*Nat'l Bank of Ky. v. Louisville Trust Co.*, 67 F.2d 97, 102 (6th Cir. 1933).

The Appellant argues that Charles Farris's affidavit and counsel for G&G's March 2, 2007, letter establish that there was an agreement. Contrary to the Appellant's position, however, there is no evidence of a "clear and certain" agreement that was "positively definite and mutually understood." Nor is there evidence that all elements of the "agreement" were understood. The March 2, 2007, letter was never signed by counsel for Citizens, the March 6, 2007, letter was not signed by counsel for G&G or Citizens, and counsel for Citizens never had authorization from her client to sign the letters. In addition, Charles Farris' affidavit indicates only that *counsel* for the parties, not the parties themselves, concurred that the best way to allocate the purchase price would be based on existing appraisals of the property, that some details were yet to be resolved, and that he understood that the allocation was subject to the court's approval. Moreover, the assignment of Citizens' claims and notes to the Appellant makes no mention of an allocation agreement. While there is, without a doubt, evidence of negotiations with an agreement in mind, the bankruptcy court's finding that there was no agreement, express or implied in fact, was not clearly erroneous.

### B. The Record Does Not Support a Finding of Detrimental Reliance

Under Kentucky law, detrimental reliance, or promissory estoppel as it is commonly called, requires:

> (1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (3) which does induce such action or forbearance; and (4) injustice can be avoided only by enforcement of the promise. *Where there is no evidence of a promise, promissory estoppel cannot be established.*

*Abney v. Amgen, Inc.*, 443 F.3d 540, 549 (6th Cir. 2006) (internal citation omitted) (emphasis added.)

There is no evidence in the record to support a finding that there was a promise to the Appellant, and therefore, he cannot establish promissory estoppel. The Appellant presented no evidence that G&G made a promise to him regarding allocation. In fact, Charles Farris' affidavit states that there were details in the proposed agreement between G&G and Citizens yet to be resolved and that the allocation and the terms were subject to court approval. Importantly, according

to his affidavit, he conveyed this information to the Appellant during the negotiation of the sale of Citizens' notes.

Additionally, the Appellant has presented no evidence to show that an "injustice can be avoided only by enforcement of the promise." The bankruptcy court found that the Appellant's actions during the auction belie his argument that he detrimentally relied on any agreement regarding the allocation of sale proceeds. However, the parties dispute what actually occurred at the auction and, absent a transcript of those proceedings, the bankruptcy court could not properly make such a finding. The error in making findings about what happened at the auction is harmless. Regardless of what happened at the auction, the court's finding regarding Appellant's actions after the auction are determinative. He filed his Objection to Report of Sale two days after the auction seeking an order for a new auction so he could bid his entire credit bid. In his brief, he stated ". . . the proposed limited re-bidding process will also eliminate the difficulty of allocating the aggregate purchase price between G&G and [Appellant] as secured creditors on different collateral. Approval of the March 7 Auction would unfairly reduce the percentage allocation that [Appellant] receives from the aggregate sale proceeds, a problem not contemplated in the Sales Procedure Order, the Notice of Auction, or by oral announcement prior to the auction." (J.A. at 187.) Certainly, if the Appellant believed that there was an agreement in place with G&G regarding the allocation, he would not have made these assertions in his objection to the sale. These assertions reveal that even two days after the auction, the Appellant believed the allocation would ultimately be based on the bidding prices made at the auction. As a result, the bankruptcy court's conclusion that the Appellant did not detrimentally rely on the alleged agreement between G&G and Citizens was not clearly erroneous.

## V. CONCLUSION

For the foregoing reasons, the order of the bankruptcy court is AFFIRMED.